On December 10, 1981, the Alabama Water Improvement Commission (AWIC) issued a National Pollutant Discharge Elimination System (NPDES) permit to the Board of Water and Sewer Commissioners of the City of Mobile (board), authorizing the discharge of pollutants into Mobile Bay from a proposed location known as the Theodore outfall. In early 1982, an administrative appeal attacking the issuance of the permit was filed with AWIC by Fowl River Protective Association (Fowl River). The Alabama Department of Environmental Management (ADEM) and the Alabama Environmental Management Commission (AEMC) are successor agencies of AWIC.
A hearing officer was appointed, and a hearing was conducted and concluded in February 1984. On September 18, 1986, the hearing officer submitted to AEMC his findings of facts, conclusions of law, and recommendation, which upheld the permit with modifications. AEMC unanimously approved the hearing officer's recommendations and issued an order modifying the permit issued to the board.
Fowl River appealed the order to the Circuit Court of Mobile County. The trial court remanded the permit to the Commission for further consideration on the issue of stratification.
ADEM, AEMC, and the board appeal the trial court's order. Fowl River cross-appeals.
 I.
This case was commenced prior to October 1, 1983; therefore, the Alabama Administrative Procedure Act has no application. § 41-22-27(e), Ala. Code 1975. State court review in this instance is governed by § 22-22A-7(c)(6), which provides the following:
 "Any order of the environmental management commission made pursuant to the above procedure, modifying, approving or disapproving the department's administrative action, constitutes a final action of the department and is appealable to the Montgomery county circuit court or the circuit court in which the applicant does business or resides for judicial review on the administrative record provided that such appeal is filed *Page 443 
within 30 days after issuance of such order."
Under this statute, the applicable standard of review arises by way of certiorari. Thompson v. Alabama Department of MentalHealth, 477 So.2d 427 (Ala.Civ.App. 1985). Under the rules of certiorari, the circuit court exercises a limited function in its review of quasi judicial acts of administrative officers and boards. Sanders v. Broadwater, 402 So.2d 1035
(Ala.Civ.App. 1981). The review is limited to a determination of whether the act in question (the issuance of the permit) "was supported by any substantial evidence, or whether the findings and conclusions are contrary to the uncontradicted evidence, or whether there was an improper application of the findings viewed in a legal sense." Id. at 1036. Accordingly, an administrative agency's decision will be affirmed unless the complaining party can prove that the agency acted in an arbitrary and capricious manner or failed to comply with applicable law. Save Our Dunes v. Alabama Department ofEnvironmental Management, 473 So.2d 521 (Ala.Civ.App. 1985). We have consistently held that, if reasonable minds differ as to an administrative agency's action or there is a reasonable basis for its decision, the action is conclusive, and we will not substitute our judgment for that of the administrative agency. State Oil Gas Board of Alabama v. Anderson,510 So.2d 250 (Ala.Civ.App. 1987); Waters v. City County ofMontgomery Personnel Board, 507 So.2d 951 (Ala.Civ.App. 1986); Hughes v. Jefferson County Board of Education,370 So.2d 1034 (Ala.Civ.App. 1979).
As noted above, the trial court remanded the permit to AEMC for further consideration of the effects of stratification. The trial court found that
 "the agencies below have not made substantial inquiry on a good and representative record into the effects of stratification by adopting the hearing officer's findings that 'such stratification is adequately compensated for by use of the averaging technique applied to the DEM.' "
The trial court further found that the agencies "failed to thoroughly investigate this phenomenon [stratification] and its possible effects."
Stratification is nothing more than a layering effect found in the water column. There is no dispute that, at times, the water in Mobile Bay is stratified. The dispute arises concerning whether or not the agencies took stratification into account in their modeling effort. Fowl River argues, and the trial court agrees, that the modeling method utilized by the agencies, the Dynamic Estuary Model (DEM), does not accurately depict the stratified waters of Mobile Bay. Therefore, Fowl River insists that the agencies' decision to uphold the permit was "arbitrary," "capricious," "unreasonable," and "not supported by substantial evidence." We have reviewed the voluminous record and have considered the expert testimony offered by both parties. We find AEMC's decision to be supported by substantial evidence.
The DEM is a modeling effort used to simulate a discharge and to determine the maximum allowable waste load which could be discharged without violating water quality standards. The DEM has been used in a number of bays in the United States and is the most proven model for estuary areas. The DEM is a two-dimensional model which simulates Mobile Bay. It is undisputed that the DEM cannot duplicate the stratified conditions of the Bay. Experts agreed that the best modeling effort would be the utilization of a three-dimensional model. However, Fowl River experts, as well as the agencies' experts, testified that they were unaware of the development of any proven three-dimensional model that could accurately depict Mobile Bay.
The project engineer for the study acknowledged that the DEM could not reproduce stratification precisely. The engineer testified that the model "takes into consideration stratification by taking the bottom and top water quality and averaging so in that way it considers stratified water body by taking an average between the top and bottom." He testified that because the DEM was incapable of precisely simulating *Page 444 
stratification, there would be a slight over-estimation of the waste load assimilative capacity of the Bay. He stated that in comparing the field testing results of both a two- and three-dimensional model, the difference in waste load allocations would be approximately ten percent. This evidence indicated that the stratification phenomenon would not make more than a ten percent difference in actual dispersion rates. Taking this evidence into consideration, the hearing officer modified the original permit to reduce the daily maximum discharge limitations for certain suspended solids and minerals by ten percent.
Other evidence similarly indicates that the agencies considered the issue of stratification in reaching their decision. The project engineer explained that "the concept that has been used in the analysis is that if the water quality objectives are achieved at the point of discharge, this will assure that water quality objectives will be met at any other point in the receiving waters." He testified that the DEM demonstrated compliance with the water quality criteria for that classification at the discharge point and at every other location in the Bay. The three Fowl River experts, as well as the agencies' experts, agreed that if water quality standards were achieved in the area of the discharge, there was no reason to think that the discharge would result in water quality standards elsewhere in the Bay not being achieved.
Additionally, the permit requires that a diffuser system be used to provide initial mixing at the outfall. The project engineer testified that the purpose of the diffuser is to mix effluent with the Bay waters. For example, if the Bay is stratified from a point five feet to the bottom with salty water and from five feet up to ten feet with fresh water, the diffuser would mix the water from top to bottom at the point of discharge. There was substantial evidence in the record that the use of the diffuser will completely compensate for any stratification that may occur and effectively obviate stratification as an issue.
After weighing the evidence, AEMC adopted the hearing officer's recommendation with modifications and concluded:
 "[T]here is substantial testimony that the Bay itself is stratified and does not necessarily mix in a uniform manner contrary to uniform scientific theory on the subject. It is possible that the currents in the different strata may be moving in different, even opposite directions. Nevertheless, for purposes of this permit application, such stratification is adequately compensated for by use of the averaging technique applied to the DEM. While the representation of the stratification at any one point would not be necessarily pinpointed by the average model, the calculations when taken as a whole, give sufficient enough representation of the strata so as to allow the Commission to use same in its deliberations. Dr. Schroeder's conclusion that the staff ignored the stratification phenomenon is unfounded.
". . .
 "The evidence is uncontroverted that the DEM is a two-dimensional model. . . . [T]wo-dimensional models can satisfactorily represent a three-dimensional system provided one dimension is substantially uniform. While Duncan testified that the DEM assumes a well-mixed and uniform vertical water column, the testimony was conflicting that the waters of Mobile Bay in the area of site A-3 have stratified because of density differences. Duncan testified that if the model could account for such stratification, it would probably make only a ten percent difference in the predicted total maximum daily waste load based on his other experience. [The Commission] finds that the daily maximum discharge limitations for BOD5, Total Suspended Solids, Total Phosphorus, Total Iron, Total Aluminum, and Total Dissolved Solids for the total facility discharge which appears on page 3 of NPDES Permit Number AL00044971 each should be modified and reduced by ten percent."
The ten percent modification and the requirement that a diffuser be utilized are indicative of the fact that the agencies took *Page 445 
into account any effect stratification would have regarding the issuance of the permit.
Our review of the record reveals that there was ample evidence on the record to support AEMC's final permit decision. Thus, it cannot be said that AEMC's decision was arbitrary, capricious, or unreasonable. Save Our Dunes v. AlabamaDepartment of Environmental Management, supra. Furthermore,
 "[i]n an administrative appeal case . . . when there is ample evidence to support the decision of the administrative agency, it is not the duty of the trial court to substitute its judgment for that of the administrative agency." (Citations omitted.)
Alabama Department of Public Health v. Perkins, 469 So.2d 651,653 (Ala.Civ.App. 1985). What the trial court has done here is to substitute its judgment on an extremely complex and technical issue, about which even the experts do not agree, for the judgment of AEMC, a seven-member body specially chosen for their expertise in areas related to environmental matters.
Here, we find it appropriate to reiterate our opinion inPerkins, 469 So.2d 651, 653,
 "that judicial deference to an administrative agency tends to insure uniformity and consistency of decisions in light of the agency's specialized competence in the field of operation entrusted to it by the legislature. Because of the specialized competency and the uniformity of decisions, a court frustrates legislative intent and usurps the discretionary role by stepping in when the agency's choice is not clearly unreasonable or arbitrary."
Accordingly, we find the trial court erred in remanding this cause to AEMC for further consideration of the stratification issue.
 II.
In its cross-appeal, Fowl River contends that AEMC's interpretation of the state's antidegradation policy is incorrect and in conflict with federal law.
We have addressed and rejected this same argument inDawson v. Alabama Department of Environmental Management,529 So.2d 1012 (Ala.Civ.App.), cert. denied, 529 So.2d 1015 (Ala. 1988). In Dawson, we wrote the following:
 "The plaintiff particularly contends, however, that the Commission's decision was arbitrary and capricious because, in approving ADEM's issuance of the sewage discharge permit, the Commission failed to apply ADEM's 'antidegradation policy.' The plaintiff contends that this policy prohibits the issuance of the subject permit.
 "This argument is basically a dispute with ADEM and the Commission as to the interpretation of the antidegradation policy, which is, in reality, a regulation contained in ADEM's administrative Code. See ADEM Administrative Code, Rule 6-10-3. It is well settled that a court should give substantial deference to an agency's interpretation of its own rules and regulations. See Personnel Board v. Bailey, 475 So.2d 863 (Ala.Civ.App. 1985).
 "The plaintiff has presented nothing which would indicate that ADEM's (and the Commission's) interpretation of the antidegradation policy as not prohibiting the issuance of the permit in this case is incorrect. In fact, it appears to this court that the Commission's interpretation that the policy allows degradation of waters within a classification, but not degradation from a higher to a lower classification without a showing of necessity, is a highly reasonable and logical construction of the policy."
We find Dawson to be controlling in this instance.
 III.
In its cross-appeal, Fowl River further asserts that AEMC did not give adequate consideration to the administrative appeal because the commissioners "did not read the exhibits in this case."
ADEM Admin. Code R. 2-1-.13 provides that a commission member who has not read the record or the transcript "shall recuse himself from voting to issue an order modifying, approving or disapproving *Page 446 
such administrative action of the Department and from participating in any discussions with other members of the commission concerning the issuance of any such order." Relying on this regulation, Fowl River argues that "since the commission members did not read the exhibits in this case, it follows that their order was not based on the evidence and is the equivalent of being without evidence to support their order and, as such, is arbitrary as a matter of law and a denial of due process."
Addressing Fowl River's argument, the trial court found the following:
 "The Court finds that Appellants' arguments with regard to AEMC members' failure to recuse themselves prior to voting to approve the permit herein are not sufficiently substantiated, and the Court will not disturb the purely ministerial workings of the commission."
The record reveals that the commissioners voting on the appeal reviewed the hearing officer's report, read the transcript of the ten-day hearing, and reviewed exhibits which each individual commissioner deemed pertinent to the appeal. We affirm the trial court's decision that Fowl River's argument is not "sufficiently substantiated" by the record.
Based on the evidence and the guiding standard of review, we reverse the order of the circuit court and remand it for entry of an order affirming AEMC's decision to approve the issuance of the permit by ADEM. We affirm the trial court's decision that AEMC gave adequate consideration to the administrative appeal.
AFFIRMED IN PART; REVERSED AND REMANDED IN PART WITH INSTRUCTIONS.
BRADLEY, P.J., and HOLMES, J., concur.