[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 448 
 ON APPLICATION FOR REHEARING
Fowl River Protective Association, Inc. ("Fowl River"), and South Alabama Seafood Association, Inc. (we refer to both appellants as "Fowl River"), appeal from a Court of Civil Appeals judgment that favors the Alabama Environmental Management Commission ("Commission") and its chairman Stanley Graves, the Alabama Department of Environmental Management ("ADEM"), and the Board of Water and Sewer Commissioners of the City of Mobile ("Sewer Board"). Because we agree with Fowl River's arguments that the Court of Civil Appeals erred when it approved both the Commission's interpretation of Alabama's antidegradation policy and the Commission's application of the evidence contained in the record, we reverse the judgment and remand the cause. Fowl River makes additional arguments, which we do not address, because we resolve the case otherwise; by not addressing those arguments, we do not mean to imply that we necessarily agree with those rulings of the Court of Civil Appeals that we do not expressly reverse.
The Alabama Water Improvement Commission ("AWIC"), the predecessor state agency to ADEM, approved the issuance of a National Pollutant Discharge and Elimination System ("NPDES") permit to the Sewer Board. That permit allowed the Sewer Board to discharge up to 25 million gallons per day of treated industrial waste and sewage into the water approximately one and one-half miles from the western shore of Mobile Bay; the proposed location for the discharge is named Theodore Out-fall. Fowl River filed an administrative appeal of the issuance of that permit, and AWIC appointed a hearing officer to conduct an administrative hearing. During the period when evidence was being presented to the hearing officer, the legislature created ADEM and the Commission, Ala. Code 1975, § 22-22A-1 et seq., which *Page 449 
replaced AWIC. The hearing officer presented his opinion with recommendations to the Commission. The Commission adopted the hearing officer's opinion, which approved the issuance of the permit with some modifications. The modifications reduced the permit allowance for fecal coliform bacteria and reduced by 10 percent the permit allowance for total suspended solids, total phosphorous, total iron, total aluminum, and total dissolved solids.
Fowl River appealed this decision to the Circuit Court of Mobile County. That court reversed the Commission's decision and remanded the case for further study; the court found that before ADEM issued the permit it had failed to investigate properly and to account for the effects of a phenomenon called "stratification" that occurs in the water of Mobile Bay. The trial court did not find that ADEM's interpretation of the state antidegradation policy was improper, however. ADEM, the Commission, and the Sewer Board appealed, and Fowl River cross-appealed. The Court of Civil Appeals reversed the trial court's holding that remanded the case to the Commission,Graves v. Fowl River Protective Ass'n, 572 So.2d 441
(Ala.Civ.App. 1988); that court held that the Commission's interpretation of Alabama's antidegradation policy was proper.Id.
In this appeal, we address two questions that Fowl River raises:
 1. Whether the Court of Civil Appeals erred when it affirmed the Commission's interpretation of Alabama's antidegradation policy.
 2. Whether the Court of Civil Appeals erred when it affirmed the Commission's application of the evidence contained in the record to the Sewer Board's request for the NPDES permit.
I. The Commission's Interpretation of Alabama's Antidegradation Policy
A. Alabama's antidegradation policy: What it is;how it works; and its statutory origin andframework in relation to NPDES permits.
The antidegradation policy is a policy promulgated by ADEM pursuant to federal statutes and regulations. That policy is stated in ADEM Admin. Code R. 335-6-10, and, according to its own terms, serves to protect, maintain, and improve the quality of the water of the state by preventing and controlling water pollution. ADEM implements that policy by using water quality standards, which provide specific scientific and technical criteria for evaluating water cleanliness. See ADEM Admin. Code R. 335-6-10, § 6.
Water quality standards are established by the water's "water use classification"; in other words, water quality standards are determined by what the water is used for. In Alabama, the water use classifications are public water supply, swimming and other whole body water-contact sports, shellfish harvesting, fish and wildlife, agricultural and industrial water supply, industrial operations, and navigation. ADEM Admin. Code R.335-6-11-.01. Public water supply is the "highest" water use classification, the classification with the most stringent restrictions on pollution; that is, water that is to be used by the public must be cleaner than water that might be used for shellfish harvesting, fish and wildlife, etc. ADEM Admin. Code R. 335-6-10, § 6. ADEM rates the uses and quality of the bodies of water within the state, and ADEM has not imposed on any water in Alabama a higher rating than that imposed on water classified as "public water supply." ADEM Admin. Code R.335-6-11-.02.
The federal and state statutory and regulatory framework that creates the antidegradation policy also prescribes the responsibility for issuing NPDES permits, like the permit that is involved in this action. ADEM must comply with the antidegradation policy when it issues NPDES permits and, thus, to understand fully how the antidegradation policy applies to this case one must understand the statutes and regulations concerned with the issuance of the NPDES permits. The statutory authority to issue NPDES permits comes from the federal Clean Water Act, 33 U.S.C.A. §§ 1251, 1342 (1986). The United States Congress directed the Environmental Protection Agency ("EPA") to administer the *Page 450 
NPDES program initially, 33 U.S.C.A. §§ 1251(d), 1342(a) (1986), and Congress gave the states the right to apply to EPA for permission to administer the NPDES program for the waters within the state. 33 U.S.C.A. § 1342(b) (1986). EPA determines whether a state is allowed to administer the NPDES program,33 U.S.C.A. § 1342, but Congress requires that each state have sufficient enabling statutes and regulations to be able to implement and comply with the provisions of the federal statutes and regulations, 33 U.S.C.A. § 1342(b) (1986). Also, EPA has promulgated regulations that include specific provisions that are mandatory for any state that administers its own NPDES program, see e.g., 40 C.F.R. 122.4, 124.11. The national antidegradation policy, by its own terms, is such a mandatory provision and is found at 40 C.F.R. 131.12; we will discuss that provision further at a later point.
EPA authorized AWIC and now authorizes ADEM to administer the NPDES program in Alabama. ADEM agreed to comply with the requirements of the Clean Water Act and all applicable EPA regulations, and ADEM, in its brief, acknowledges that it is bound by federal statutes and EPA regulations. Accordingly, when ADEM issues an NPDES permit, it must do so in accordance with the provisions of the relevant federal statutes and those portions of the EPA regulations that are mandatorily applicable to the state's administration of its own NPDES program.
EPA promulgated the national antidegradation policy to conserve, protect, maintain, and improve the waters of the nation by preventing and controlling water pollution,40 C.F.R. 131.12, as the state antidegradation policy also serves to do. The national antidegradation policy uses water quality standards in a manner similar to the way Alabama uses them. The Clean Water Act allowed EPA to promulgate regulations setting forth water quality standards for states exercising NPDES permitting authority. Pursuant to that statutory authority, EPA adopted water quality standards applicable to the states in40 C.F.R., Part 131. Part of that provision is 40 C.F.R. 131.12, the national antidegradation policy, which reads:
" § 131.12 Antidegradation policy.
 "(a) The State shall develop and adopt a statewide antidegradation policy and identify the methods for implementing such policy pursuant to this subpart. The antidegradation policy and implementation methods shall, at a minimum, be consistent with the following:
 "(1) Existing instream water uses and the level of water quality necessary to protect the existing uses shall be maintained and protected.
 "(2) Where the quality of the waters exceed levels necessary to support propagation of fish, shellfish, and wildlife and recreation in and on the water, that quality shall be maintained and protected unless the State finds, after full satisfaction of the intergovernmental coordination and public participation provisions of the State's continuing planning process, that allowing lower water quality is necessary to accommodate important economic or social development in the area in which the waters are located. In allowing such degradation or lower water quality, the State shall assure water quality adequate to protect existing uses fully. Further, the State shall assure that there shall be achieved the highest statutory and regulatory requirements for all new and existing point sources and all cost-effective and reasonable best management practices for non-point source control.
 "(3) Where high quality waters constitute an outstanding National resource, such as waters of National and State parks and wildlife refuges and waters of exceptional recreational or ecological significance, that water quality shall be maintained and protected."
40 C.F.R. 131.12 (emphasis supplied). 40 C.F.R. 131.12(a)(1) unequivocally commands that existing instream water uses and the level of water quality necessary to maintain those uses be maintained and protected.
ADEM states in its brief that while "the language [of the state and national antidegradation *Page 451 
policies] may be different, the substance of the policies is the same." At least as to matters related to this appeal, we agree with ADEM that the state and federal antidegradation policies are substantially the same. The state antidegradation policy states, in pertinent part:
 "The purpose and intent of the water quality standards is to conserve the waters of the State of Alabama and to protect, maintain and improve the quality . . . of public water supplies for the propagation of wildlife, fish and aquatic life, and for domestic, agricultural, industrial, recreational and other legitimate beneficial uses; and to provide for the prevention, abatement and control of new or existing water pollution. . . .
 "Waters of quality higher than that established by the standards . . . shall be maintained at that high quality . . . provided that the Commission has the authority to approve a new or increased discharge of wastes to a high quality water upon demonstration that such discharge is necessary for economic or social development."
ADEM Admin. Code Chap. 6-10, pp. 10-3, 10-4.
B. The hearing officer's holdings, which theCommission adopted.
In his report to the Commission, the hearing officer made this statement, which the Commission adopted, concerning Fowl River's administrative appeal of the issuance of the NPDES permit:
"ANTIDEGRADATION POLICY
 "There is substantial conflict of opinion as to whether the Antigradation Policy of ADEM is applicable to Mobile Bay. The Hearing Officer finds that it is not applicable.
 "This holding is based on the interpretation by the Environmental Management Commission in its January 8, 1986, decision in JaNay Dawson v. Alabama Department of Environmental Management, Docket No 85-09. There, petitioners sought to prevent a sanitary waste discharge into a body of water classified for Swimming and Other Whole Body Water-Contact Sports and Fish and Wildlife. The Department argued that the antidegradation policy was inapplicable to waters which were not of a quality higher than that associated with the public water supply water use classification. The Hearing Officer and Commission agreed and determined that the policy did not apply to the body of water at issue.
 "Here, Petitioners have failed to present any evidence that the water quality of Mobile Bay was higher than that associated with the public water supply water use classification on the effective date of the standards. Likewise, there is no evidence that the quality of waters in Mobile Bay has ever been better than public water supply quality, in fact, the contrary is the case.
 "Even assuming that the antidegradation policy is applicable to Mobile Bay, the Hearing Officer is of the opinion that the permitted discharge will not violate that policy. The permit requires that the discharge meet the more stringent Shellfish Harvesting standards (fecal coliform = 14 MPN/100 ml) at the perimeter of the mixing zone within the Swimming water use classification area where the fecal coliform criterion is 100/100 ml. In doing so, the impact of the discharge will not cause a violation of the standards or degradation of water quality in either classified area. Petitioners have failed to present any evidence that the permitted discharge will degrade existing water quality."
The hearing officer's report does not otherwise address whether the antidegradation policy applies to Mobile Bay or to what water the policy applies.
C. Summary of Fowl River's argument.
Citing the hearing officer's report, Fowl River states that the hearing officer and the Commission held that the antidegradation policy does not apply to Mobile Bay because the antidegradation policy does not apply to waters that are "not of a quality higher than that associated with the public *Page 452 
water supply water use classification" and Mobile Bay's water does not presently have a water quality higher than the public water supply use classification, nor has it ever had such a quality.
Fowl River states that Mobile Bay, like all coastal waters, will probably never have a water quality level higher than the public water supply use classification, because the Bay and all coastal waters contain salt, which makes the water unfit for drinking and public use. Accordingly, Fowl River argues, the Commission's holding, in effect, bars the antidegradation policy from applying to any coastal waters.
Furthermore, Fowl River points out, the water use classifications that ADEM uses are those established by its own regulations. The highest water use classification established in those regulations is public water supply; also ADEM, in its water use classifications, does not rate any body of water in Alabama as better than public water supply. Accordingly, Fowl River argues, the Commission's interpretation that the antidegradation policy does not apply to water that is not "higher" than the public water use classification means both by definition and in practical effect that there are no bodies of water within the state to which the antidegradation policy applies.
That is an improper interpretation of the antidegradation policy, Fowl River argues. The national policy and the state policy both require that ADEM protect the level of water quality necessary to maintain existing water uses. By making a ruling that, according to Fowl River, in effect interprets the antidegradation policy out of existence, the Commission has violated that policy, because such an interpretation of the policy cannot maintain and protect existing uses of the water.
D. ADEM's arguments,[1] the Court's analysis,and Dawson v. ADEM.
ADEM contends that the hearing officer and the Commission did not hold that the entire antidegradation policy did not apply to Mobile Bay. ADEM states that to understand the hearing officer's report, one must distinguish between two types of water, as Alabama's antidegradation policy does: waters of a quality higher than that established by the water use classification and waters that fall within the water use classifications. ADEM argues that the hearing officer and the Commission held that the portion of the antidegradation policy that did not apply to Mobile Bay was the portion of the policy that relates to waters of a quality higher than the waters described in the water use classifications. In other words, ADEM contends that what the hearing officer and the Commission held was that the portion of the antidegradation policy that applies to waters that are cleaner than public water supply is the portion of the antidegradation policy that does not apply to Mobile Bay.
We reject this argument. Although the hearing officer and the Commission may have meant to hold exactly what ADEM argues, that is not what they actually held. The hearing officer's opinion, which the Commission adopted, unequivocally states that the antidegradation policy does not apply to Mobile Bay. ADEM seems to argue that the discussion of the Dawson case tempers the unequivocal statement that the antidegradation policy does not apply to Mobile Bay. The discussion of theDawson case can be interpreted to mean at least two things. It could mean, as ADEM argues, that the Commission found that the portion of the antidegradation policy that applies to waters of a quality higher than public water use is the portion of the antidegradation policy that did not apply to Mobile Bay. On the other hand, when the hearing officer is explaining why he contends that the permit would not violate the antidegradation policy even if the policy applied, he makes specific references to shellfish harvesting and swimming water quality standards, which are, of course, water standards below public water use. Why would the hearing officer write of *Page 453 
those standards hypothetically applying, if, indeed, he meant that those standards did apply and that the only part of the antidegradation policy that did not apply was the part that applied to waters higher than public water use? Considering the import of this matter, we will not allow ADEM's after-asserted arguments to redeem a holding by the Commission that on its face and by reasonable interpretation excludes Mobile Bay from Alabama's antidegradation policy.
Even if we were to hold with ADEM on that point, we would still confront the holding of the hearing officer and the Commission that "the antidegradation policy is inapplicable to waters which were not of a quality higher than that associated with the public water supply water use classification." Neither the Court of Civil Appeals nor any of the appellees address this matter directly, even though Fowl River forcefully contends that this interpretation of the antidegradation policy is improper.
As we discussed earlier, public water supply is the highest water use classification. Accordingly, almost by definition, if the antidegradation policy applies only to waters with a quality higher than public water supply, then, pursuant to the Commission's holding, the antidegradation policy will not apply to any water in the state. Nevertheless, there might be water somewhere in the state that is cleaner than the standards established for public water supply. According to ADEM's own ratings of water use, however, there is no water in the state that is rated better than public water supply. Thus, under the Commission's holding, the antidegradation policy would not apply to any water in the state to which ADEM has currently assigned a water use classification. ADEM has assigned a water use classification to most of the state's waters. See, ADEM Admin. Code R. 335-6-11. Additionally, coastal waters, because of their salt content, do not meet even the requirements for public water supply, much less requirements for water that is cleaner than public water supply; the Commission's holding, accordingly, excludes coastal waters from the antidegradation policy at least until, at a practical level, either the waters no longer contain salt or the standards for public water supply are lowered below such waters.
As background for further analysis of this case, we now consider Dawson v. Alabama Department of EnvironmentalManagement, 529 So.2d 1012, cert. denied, 529 So.2d 1015 (Ala. 1988), before addressing the remainder of ADEM's arguments.
In Dawson, ADEM issued a sewage discharge permit to Longcrier Builders and Development, Inc. That permit allowed Longcrier to discharge 80,000 gallons of sewage per day into Boggy Branch, a body of water located in Southern Baldwin County. Dawson appealed ADEM's issuance of the permit, and the hearing officer, the Commission, and the Circuit Court of Baldwin County upheld ADEM's action.
The Court of Civil Appeals affirmed the trial court's judgment. Pertinently to this case, the court stated:
 "[I]t appears to this court that the Commission's interpretation that the policy allows degradation of waters within a [water use] classification, but not from a higher to a lower [water use] classification without a showing of necessity, is a highly reasonable and logical construction of the policy."
529 So.2d at 1015.
It is unclear whether that statement is a holding or is dictum. We denied Dawson's petition for writ of certiorari, with this explanation:
 "In denying the writ of certiorari in this case, we should not be understood as approving all of the statements made in the opinion of the Court of Civil Appeals, 529 So.2d 1012, especially those regarding the scope of review. Our denial of certiorari in this case is based upon the finding by the Court of Civil Appeals that the constitutional claims petitioner seeks to present on certiorari were raised for the first time in the Court of Civil Appeals."
Remembering that ADEM acknowledges that the state and national antidegradation policies are substantially the same, we must evaluate the statement in Dawson in *Page 454 
light of the state and national antidegradation policies. The state policy pertinently provides:
 "The purpose and intent of the water quality standards is to conserve the waters of the State of Alabama and to protect, maintain and improve the quality thereof for public water supplies for the propagation of wildlife, fish and aquatic life, and for domestic, agricultural, industrial, recreational and other legitimate beneficial uses; and to provide for the prevention, abatement and control of new or existing water pollution."
ADEM Admin. Code R. 335-6-10. That statement, explaining the thrust of the antidegradation policy, is phrased more broadly than the national antidegradation policy, which provides some clarification and specific meaning to Alabama's antidegradation policy:
 "(1) Existing instream water uses and the level of water quality necessary to protect the existing uses shall be maintained and protected.
 "(2) Where the quality of the waters exceed levels necessary to support propagation of fish, shellfish, and wildlife and recreation in and on the water, that quality shall be maintained and protected unless the State finds, after full satisfaction of the intergovernmental coordination and public participation provisions of the State's continuing planning process, that allowing lower water quality is necessary to accommodate important economic or social development in the area in which the waters are located. In allowing such degradation or lower water quality, the State shall assure water quality adequate to protect existing uses fully."
40 C.F.R. 131.12. (Emphasis supplied.)
A careful comparison of the statement in Dawson to the antidegradation policy reveals that they conflict. Dawson
states that the antidegradation policy allows degradation of waters within a classification, but not degradation from a higher to a lower classification without a showing of necessity. Accordingly, under Dawson, it would be permissible to degrade water from one water use classification to another, if there is a showing of necessity. The antidegradation policy, on the other hand, provides that water may be degraded withinits classification if there is a showing of economic or social necessity. In that degradation, however, the policy requires that the water quality be maintained to "protect existing uses fully." Furthermore, the policy in another provision explicitly commands that existing water uses and the level of water quality necessary to protect the existing uses "shall be maintained and protected." The policy does not say or even imply that water may be degraded from one classification to another, as Dawson states. Thus, if there is a showing of economic or social necessity, the water described in40 C.F.R. 131.12(a)(2) and ADEM Admin. Code ch. 6-10, p. 10-3 may be degraded within its classification, but water may never be degraded from a higher classification to a lower one. Although it is unclear whether the statement in Dawson is dictum or is a holding, to the extent that Dawson differs from this decision, it is overruled. We explain presently why this discussion is relevant and important to this case. For now, we return to ADEM's final two arguments.
ADEM argues that the Commission's interpretation of the antidegradation policy does not violate the antidegradation policy, because, it says, the state antidegradation policy does not conflict with the federal antidegradation policy. That argument does not explain or even address the relevant issue, which is whether the Commission's holdings in effect interpret the antidegradation policy in such a way that its provisions will not be applied to any water to which ADEM has currently assigned a water use classification. We address the argument, however, because ADEM's brief spent so much time with it that even Fowl River was ultimately forced into addressing the argument as though it were relevant.
ADEM says that the state antidegradation policy, ADEM Admin. Code R. 335-6-10, does not conflict with the federal antidegradation policy, 40 C.F.R. 131.12, and *Page 455 
that the policies are, indeed, substantially the same. That portion of the argument is addressed to Fowl River's statement that the holdings of the Commission and the hearing officer violate the antidegradation policy. ADEM's argument, even at this point, does not address the substance of Fowl River's contention, however. Fowl River does not argue that the state's antidegradation policy stated in the ADEM administrative code violates the federal antidegradation policy; Fowl River, in its briefs supporting the petition for certiorari, does sometimes equate the Commission's holdings with the state antidegradation policy and argue that that is inconsistent with the national policy. However, the real thrust of Fowl River's argument, with which we agree, is that the Commission's holdings in this case conflict with the antidegradation policy by interpreting the policy so that it would not apply to waters that the policy by its own terms does apply to; furthermore, Fowl River argues, and we agree that that holding by the Commission at a practical level allows degradation of the water in violation of the antidegradation policy.
ADEM further argues that the only time a state-issued permit is governed by federal regulations is when the proposed permit is submitted to EPA by ADEM before ADEM makes its decision on the permit. ADEM asserts that even when it submits the request for the permit to EPA, "even if, for some reason, the permit does not comply with federal regulations, it can only be invalidated by a party other than EPA if state requirements are not met." In other words, ADEM argues that only EPA and not state courts can review ADEM's compliance with federal statutory and regulatory requirements.
We are inclined to disagree with this argument, because state courts often review and even interpret federal statutes and regulations. For example, state courts review actions involving the Federal Employers Liability Act (FELA), the Employees Retirement Income Securities Act (ERISA), and the Comprehensive Omnibus Budget Reconciliation Act (COBRA), and entertain actions brought pursuant to 42 U.S.C. § 1983, to name but a few. See, e.g., Illinois Central Gulf R.R. v. Price,539 So.2d 202 (Ala. 1988) (federal statutes circumscribe right to recovery in FELA action); Harbor Insurance Co. v. Blackwelder,554 So.2d 329 (Ala. 1989) (whether insurance plan was "governmental plan" under ERISA); HealthAmerica v. Menton,551 So.2d 235 (Ala. 1989) (ERISA). Indeed, state courts can even review a state statute's and a state agency's compliance with the United States Constitution. See, e.g., Dawson v. Cole,485 So.2d 1164 (Ala.Civ.App. 1986) (whether agency's actions and Alabama statute violated due process).
We need not rule on ADEM's argument, however, because we resolve the case otherwise. We have noted that ADEM says that the state and national antidegradation policies are substantially the same and that, at least for this issue presented by this appeal, we agree. Accordingly, we need not address the issue exclusively in terms of the national antidegradation policy, inasmuch as the state and national policies are substantially the same and it is the state policy that is at issue. The national policy clarifies and provides some specific meanings to the state policy, much as federal laws that serve as basic patterns for state laws occasionally do. See, e.g., Rice v. Alabama Surface Mining Commission,555 So.2d 1079 (Ala.Civ.App. 1989), cert. denied, 555 So.2d 1079
(Ala. 1990) (where Ala. Code 1975, § 9-16-93(f), based on 30 U.S.C. § 127(c), was interpreted to define "agent" by using federal law). Nevertheless, the state policy is dispositive of this issue, although the policy is clarified and explained by the national policy.
To make our final holding on this issue, we must discuss together several points previously raised. The antidegradation policy requires that the existing uses for the state's water be protected, maintained, and improved. The Commission held that the antidegradation policy did not apply to waters that were not higher quality waters than public water supply. Because ADEM does not rate any water in the state as cleaner than public water supply, the Commission's holding, if allowed to stand, *Page 456 
would mean at a practical level that the antidegradation policy would not apply to any water in the state to which ADEM has assigned a water use classification. That holding conflicts with the antidegradation policy itself, by interpreting the policy so that it would not apply to waters that the policy by its own terms does apply to, despite the Commission's holding. Additionally, at a practical level, that holding would allow the degradation of waters that the policy by its own terms applies to, and that degradation potentially violates the antidegradation policy. Moreover, our discussion of the Dawson
case showed that the antidegradation policy mandates that in order for the water involved in this case to be degraded within its water use classification a showing of economic or social necessity is required and that existing water uses must be maintained. The Commission's holding would allow degradation of water within a water use classification without a showing of social or economic necessity, and the holding would allow degradation of water from its existing uses. For all these reasons, the Commission's holding cannot be sustained. Furthermore, our discussion in Part II.C. of the next issue indicates that the Commission's holding would likely result in water quality violations in relation to dissolved oxygen, a water quality standard.
The Court of Civil Appeals erred when it upheld the Commission's interpretation of the antidegradation policy.
II. Establishing an accurate factual basis for determining whether the permit should be denied
A. Background and Overview.
This issue addresses the application by the hearing officer and the Commission of the evidence contained in the record to the Sewer Board's request for the NPDES permit; it also addresses the Court of Civil Appeals' judgment that affirmed the actions of the hearing officer and the Commission.[2] Because the issue is complex, we give an overview of the evidence that the record discloses, as well as some additional background of the proceedings that led to the Sewer Board's being granted the NPDES permit.
The South Alabama Regional Planning Commission ("SARPC") had responsibility for developing the waste disposal plan involved in this appeal. SARPC obtained funds from EPA for a "208 study," which was used to attempt to determine whether one site could be selected in Mobile Bay that would provide adequate environmental protection for discharging effluents from the Theodore area. SARPC hired Water Research Engineers ("WRE") to perform a dynamic estuary model ("DEM") for portions *Page 457 
of Mobile Bay. The DEM is not a mock-up or scale model, but is, instead, a series of mathematical calculations performed by a computer. The DEM had two variations, a "coarse grid" and a "fine grid." SARPC originally planned to use the DEM to eliminate all but two of the proposed sites and then to choose between those two sites by using a physical model of Mobile Bay built by the United States Army Corps of Engineers at its Waterways Experiment Station in Vicksburg, Mississippi. The record indicates, however, that SARPC primarily relied on the DEM in making its final proposed site selections and almost exclusively relied on the DEM in estimating the amount of effluent that should be discharged into Mobile Bay. The Corps of Engineers prepared the Environmental Impact Statement ("EIS") for SARPC.
The disputed factual issues disclosed by the record primarily concern a phenomenon called stratification, which occurs in the water of Mobile Bay. It is undisputed that stratification occurs in Mobile Bay. It occurs to some extent virtually every day, unless there is strong wind. Mobile Bay is highly stratified during most of the summer and early fall, although only in the last 10 or so years have scientists noted the frequency of stratification in Mobile Bay. Stratification occurs when waters of different densities come together. Waters of different densities will not mix; that means, for example, that in a column of water that is 10 feet deep there may be entirely different layers of waters of different densities, each traveling and flowing in a different or even opposite direction. At Mobile Bay, stratification occurs because of the inflow of fresh water from rivers into the salt water of the Gulf of Mexico. Fresh water is less dense than salt water, and the more dense salt water tends to sink to the bottom.
The purpose of the NPDES permit is to establish limitations on the amount of pollutants that a permittee may discharge that will allow the receiving water to assimilate the waste and still comply with the water quality standards established by the specific water use classification assigned to that body of water by ADEM. When ADEM approves the issuance of an NPDES permit, ADEM supposedly has determined that the proposed permit will allow water quality standards within the applicable water quality classification to be maintained. The hearing officer and the Commission approved this permit and imposed dischargelimitations on the effluents that were the same as the maximumwasteload allocations determined by the fine grid DEM. (Certain discharges were reduced by 10 percent; see the introduction to this opinion, supra.)
Although the record discloses many problems with the DEM, which we address in the following discussion, in this overview we address only one of the problems. It is undisputed that the DEM cannot simulate stratification, because it assumes that the water receiving the pollution is homogeneously and uniformly mixed from top to bottom and that the effluent, once discharged, will rise to the surface. During stratified conditions, however, the effluent will not mix with all of the water, but, rather, will mix, if it mixes at all, only with that layer of water most similar in density to the density of the effluent. Because the DEM assumes that the effluent mixes with all of the water, when, in fact, the effluent would only mix with a portion of the water, the DEM necessarily overstates the volume of water available for mixing with the effluent during periods of stratification. That miscalculation makes the DEM necessarily overestimate how much effluent can be discharged into the water and still maintain water quality standards.
In relation to dissolved oxygen, a water quality standard applicable to all water use classifications relevant to this case, those overestimates are of particular concern. Dissolved oxygen in water is necessary for marine life, much as oxygen in the air is necessary to life on land, and the dissolved oxygen standard for all of the water use classifications of Mobile Bay is the same. The effluent contains chemical and biochemical materials that react with the water and organisms in the water to consume *Page 458 
dissolved oxygen. Under stratified conditions, there is less volume of water for the effluent to mix with, as we discussed. Because of this, the effluent discharged will cause chemical and biochemical oxygen-demanding reactions in a lesser volume of water than was estimated. Accordingly, water quality violations will result or, at the least, may result, the record indicates. A violation of dissolved oxygen standards can be particularly significant to marine life, because without sufficient dissolved oxygen, marine life dies.
B. Stratification, the DEM, and the "averagingtechnique."
As we described stratification in the overview, it is a vertical layering of the water in Mobile Bay. Usually, there are two layers, with fresh water generally on top and salt water on the bottom, although sometimes there can be three layers.
Stratification in a shallow estuary such as Mobile Bay defies science's fundamental understandings of both stratification and shallow estuaries. According to scientists from Dauphin Island Sealab and a scientist from the University of South Alabama ("USA"),[3] science has only recently noted and understood that stratification in Mobile Bay occurs as frequently as it does. Those scientists explained that Mobile Bay is highly stratified throughout most of the summer, even into early fall, and that unless there is a strong wind, the Bay is stratified to some extent nearly every day.
As we stated in the overview, waters of different densities do not mix, so in Mobile Bay there may be a layer of fresh water, a layer of salt water, and possibly even another layer of water, salt or fresh, each layer traveling and flowing in a different or even opposite direction. If the effluent is discharged into Mobile Bay, it will attempt to mix with the stratum of water most similar to its own density. Accordingly, if the density of the effluent is more similar to the density of the bottom layer, it will mix only with the water in that bottom stratum and will be dispersed in whatever direction the bottom stratum is flowing. If the effluent is denser than the upper stratum and less dense than the lower, the effluent will form its own stratum in between. For example, according to Dr. Eldon Carl Blancher, the USA scientist:
 "There are times in the Bay that you can go out there and you can drop — if you dropped a dense substance in it, it would go down and plateau and sit right in the middle of the [water] column because of the two stratified conditions in there."
The DEM's purpose is to simulate both the water receiving the effluent and the proposed discharge in order to determine the maximum amount of specific pollutants that the receiving water can assimilate without violating water quality standards. The amount of waste that it determines can be assimilated is called the "wasteload allocation." The wasteload allocation was determined by gradually increasing the concentrations of waste in the DEM in a fixed, predetermined volume of effluent flow until the computer showed a violation of water quality standards in the water receiving the effluent. The DEM is a two-dimensional model, because it simulates two dimensions of the receiving waters.
With the foregoing factual background, we consider the DEM. There are several deficiencies in the DEM that must be considered, because the NPDES permit's effluent limitations are based on the maximum wasteload allocations determined by the fine grid DEM, and furthermore, the Commission recommended that the NPDES permit limitations be the same as the maximum wasteload allocations determined by the fine grid DEM, with the few reductions discussed earlier. Any deficiencies of the DEM in determining the proper wasteload allocations are, accordingly, directly transferred to the NPDES permit. *Page 459 
The first deficiency of the DEM is that it is a two-dimensional model used to describe a three-dimensional environment, Mobile Bay. In fairness, we must note that the DEM was the state-of-the-art model when it was originally used, and, at the time of the adjudicatory hearing, no reliable three-dimensional model existed. Nevertheless, because of the many deficiencies of the DEM, its maximum wasteload allocations should not be used as the determinative factor in establishing for the NPDES permit the amount of waste to discharge.
According to Dr. Schroeder, one of the scientists from Dauphin Island Sealab, the salinity and temperature of the water in Mobile Bay varies from the surface of the water to the bottom of the water, as well as from the north of the Bay to the south, and from the east to the west. Accordingly, the water must be looked at three-dimensionally. To look at the water two-dimensionally sacrifices one dimension. The DEM uses one vertical average for salinity; that is, the salinity value used by the DEM was determined by averaging salinity readings taken from various points near the surface with salinity readings taken from various points near the bottom. That average became the one assigned salinity value. As we mentioned before, there is almost always some stratification in the Bay, and there is high stratification during most of the summer and even into early fall. The stratification is usually caused by salinity differences in the water; that is, the more saline, thus denser, salt water forms its own layer at the bottom. The DEM cannot simulate stratification when there is one average, one point used to determine the value of the salinity dimension. As Dr. Schroeder said, "of course, stratification just doesn't show up when you're averaging, when you have only one point. You need two points to see stratification."
We noted a second deficiency in the DEM in the overview: it cannot simulate stratification, because it assumes a homogenous water mixture. The scientists from Dauphin Island Sealab and the EIS agree on this point. Joe Duncan, SARPC's project engineer who supervised the 208 study, conceded as much:[4]
 "Duncan: The Dynamic Estuary Model assumes the complete mix, and it would move with the circulation of the water.
 "Laurendine: And the complete mix means no stratification whatsoever? "Duncan: That's correct."
That point leads to a related, vitally important point. The DEM assumes that the water is homogeneously mixed and that the effluent mixes with all the water of the Bay. During periods of stratification, however, the effluent will mix, if it mixes at all, only with that layer of water most similar in density to the density of the effluent. Because the DEM assumes that the effluent mixes with all the water, when, in fact, the effluent would mix with only a portion of the water, the DEM necessarily overstates the volume of water available for mixing with the effluent. That miscalculation makes the DEM necessarilyoverestimate how much effluent can be discharged into the waterand still maintain water quality standards, because the sameamount of effluent for the maximum wasteload allocationdetermined by the DEM would be discharged into a lesser volumeof water than the DEM assumed was available for mixing. Dr. Schroeder addressed that deficiency in the DEM:
 "Laurendine: In your opinion, is it likely that the use of a nonstratified mathematical model to estimate . . . the capacity of the receiving water to assimilate a wasteload — is it likely that a nonstratified model is likely to overestimate the assimilative capacity of the receiving water? "Schroeder: Yes.
 "Mr. Ludder: Objection. He is not qualified to answer that. He is neither a modeler nor an engineer.
 "The Court: I'm going to hear it, anyway. Go ahead. *Page 460 
 "Schroeder: Well, I'll answer it in a non-engineering and a nonmodeling capacity. If you take a given volume of water, an ideal in volumes of water, and you pour something into it, you have a fixed volume in which to disperse whatever you're dropping into it. If I stratify that environment, making the lower portion of water inaccessible to the upper portion, and if I pour what I'm going to pour into either one of those volumes and not allow any of the mixing to occur in the other, then obviously I've reduced the volume of water that I'm dispersing, what I'm pouring in. And so its effect in dilution is less.
 "So, if you have a fixed . . . volume of water that you're going to mix something into, you obviously have a larger volume to disperse whatever you're putting in. To stratify it, you have less of a volume, your dilution will not be as great."
Another deficiency of the DEM is that it assumes that the effluent will have only one density, or, stated another way, the DEM does not consider the effect of different effluent densities. The Corps of Engineers in the EIS addressed that deficiency:
 "A limitation of the modeling efforts is the lack of consideration of the effect of different effluent densities on dispersion characteristics. The complete mixing of the effluent with the receiving water that is inherent in the computer model implicitly assumes an effluent density equal to the receiving water. . . . As discussed in Chapters 2 and 3, however, the expected chloride content of the effluent and the variable salinity regime in Mobile Bay can produce situations in which the discharge can sink to the bottom, rise to some intermediate depth, or rise to the surface of the Bay depending on the combination of density factors at any particular time. The computer model cannot be used to consider this case. . . . No quantitative analysis is available from the present modeling results of the variation in dispersion characteristics that could occur with variation in plume behavior. ['Dispersion' means the effluent's mixing with the water.]"
Accordingly, another deficiency of the DEM is that it cannot determine the extent to which the effluent will disperse in the water if the effluent has a density other than the density of the water receiving it. Furthermore, unless the effluent has a density similar to that of the water, when the water is stratified — and with the effluent naturally seeking to mix with water of a density similar to its own — the DEM cannot explain whether the effluent will mix with the top or with the bottom layer of the water, or whether it will simply sink to the bottom or form its own layer.
Still another deficiency of the DEM results from its assuming a homogenous mixture of water and, also, assuming that the circulation pattern of the water is the same from the bottom to the top. As we have discussed, stratification can result in different layers of water traveling different, even opposite directions. Accordingly, during periods of stratification, the DEM may or may not represent the circulation of the water and its concurrent effects on the dispersion of the effluent.
A similar deficiency in the DEM involving the water's circulation and the effluent's circulation concerns the DEM's assumption that the effluent will normally rise to the surface of the water. Because more dense solutions tend to sink below less dense solutions, the effluent is unlikely to come to the surface after discharge if it is denser than any part of the water and stratified conditions exist at the time of the discharge. The DEM can, at best, describe surface circulation. It cannot analyze any subsurface circulation of the effluent. Indeed, according to the EIS, no mathematical method exists for analyzing the behavior of the effluent if the effluent does not come to the surface.
Joe Duncan testified as follows:
 "Laurendine: Wouldn't your model show that the — if you had a single water column, you know, like you had showed, and you know, a directional, you know, circulation pattern south, wouldn't it show everything moving south?
"Duncan: If I want to . . . *Page 461 
 "Laurendine: Wouldn't it show everything moving south?
 "Duncan: If the surface circulation is in that direction.
 "Laurendine: That's what I just gave you as a hypothetical. So if it's showing the surface circulation to be in a southerly direction, it's going to show dispersion only south?
"Duncan: Right.
 "Laurendine: And if, in fact, you have a stratified situation with the surface strata going that way, going south, and the subsurface strata going north, then it is not going to give you any information about what portion of that pollutant went north; is it?
"Duncan: That's not critical . . .
"Laurendine: Is it?
"Duncan: . . . to the situation.
"Laurendine: Is it?
"Duncan: No, it will not."
Thus, according to Duncan, not only will the DEM fail to analyze what direction any effluent below the surface is circulating in, but also the DEM will misstate the direction of any subsurface circulation that flows in a direction different from surface circulation. Accordingly, once again, during periods of stratification, the DEM cannot analyze the behavior of effluent discharged into Mobile Bay. Furthermore, in this instance, the DEM cannot analyze the behavior of the effluentany time that it is denser than any part of the water column and thus does not rise to the surface.
Despite all the evidence of the deficiencies of the DEM mentioned in this opinion, as well as evidence of other deficiencies of the DEM not mentioned in this opinion, the hearing officer and the Commission made the following findings, which the Court of Civil Appeals affirmed:
"PHYSICAL CHARACTERISTICS OF THE BAY
 "The Hearing Officer finds that there is substantial testimony that the Bay itself is stratified and does not necessarily mix in a uniform manner contrary to uniform scientific theory on the subject. It is possible that the currents in the different strata may be moving in different, even opposite directions. Nevertheless, for purposes of this permit application, such stratification is adequately compensated for by use of the averaging technique applied to the DEM.
While the representation of the stratification at any one point would not be necessarily pinpointed by the averaged model, the calculations when taken as a whole, give sufficient enough representation of the strata so as to allow the Commission to use same in its deliberations. Dr. Schroeder's conclusion that the staff ignored the stratification phenomenon is unfounded."
The hearing officer created the term "averaging technique." The record does not contain references to an "averaging technique" or to any similarly named method by which the DEM could "compensate" for stratification.
The basis for the hearing officer's creation of the "averaging technique" is Duncan's testimony. Duncan testified that "[the DEM] takes into consideration stratification by taking the bottom and top water quality and averaging so in that way it considers stratified water body by taking an average between the top and bottom." Duncan further testified that "the [DEM] would take [stratification] into account byaveraging the top and bottom density." Duncan also testified that the model could average effluent concentrations from top to bottom and that that might help compensate for stratification.
The hearing officer's "averaging technique" does not prove that the DEM can compensate for stratification. To understand that, recall Dr. Schroeder's testimony in the earlier discussion of the DEM, where we explained that when Mobile Bay is stratified, the DEM overstated the volume of water available for mixing with the discharged effluent. The volume of water available for mixing with the effluent is a key to the degree to which the effluent will disperse in the water. Duncan testified that, by averaging the density of the water from the top to the bottom and averaging *Page 462 
the concentrations of effluent from top to bottom, the DEM compensates for stratification; this testimony, if true, would mean that the model compensates for the lack of volume by changing its assumptions for the density of the water and for the concentration of the effluent. Averaging the density of the water or averaging the concentration of the effluent cannot affect the volume of water that will actually be available to mix with the effluent, however. An example from Fowl River's brief illustrates the fallacy involved in Duncan's testimony. Fill a bucket with water that has a specific water quality and then put in the water the maximum amount of waste that the bucket of water can assimilate and still meet the specific water quality standard. Fill a second identical bucket half full of the same quality water, but put the same amount of waste in that bucket that was put in the full bucket. If you mix the waste thoroughly with the water in each bucket, the second bucket of water will be more contaminated and cannot meet the same water quality standard that the full bucket will meet. Any assumptions about the density of the water and the concentration of the effluent are not going to affect the degree of dispersion actually achieved in the second bucket. The DEM again fails to compensate for stratification, because averaging the densities or concentrations cannot affect the volume of water actually available for mixing.
In summary, the record indicates that Mobile Bay is too complex an environment for the DEM to simulate. We have documented numerous factors that could affect water quality that the DEM cannot analyze. Considering our discussion, and mindful that the Commission recommended that the NPDES permit's effluent limitations be the same as the maximum wasteload allocation determined by the fine grid DEM, we hold that the Court of Civil Appeals erred when it reversed the trial court's judgment, which stated:
 "The Court finds that the agencies below have not made substantial inquiry on a good and representative record into the effects of stratification by adopting the hearing officer's findings that 'such stratification is adequately compensated for by use of the averaging technique applied to the DEM.' The Court further finds that there is no substantial evidence on the record that the averaging technique of the DEM compensates for the phenomenon of stratification; that the agencies below failed to thoroughly investigate this phenomenon and its possible effects. . . ."
C. Stratification, Dissolved Oxygen, and FecalColiform Bacteria.
This discussion properly involves the relationship of stratification, dissolved oxygen, and fecal coliform bacteria; however, ADEM's attempt to equate all water quality standards with the water quality standards concerning fecal coliform bacteria led the Court of Civil Appeals to factual errors, which we must also discuss.
Dissolved oxygen in water is necessary for marine life, much as oxygen in the air is necessary to life on land. Dissolved oxygen is a water quality standard established in ADEM's administrative regulations. It applies to all water use classifications. The effluent contains chemical and biochemical materials that react with the water and organisms in it to consume the dissolved oxygen. Dr. Blancher provided this explanation of the reduction of dissolved oxygen in the water, if the effluent is discharged as proposed:
 "Laurendine: Do you see any potential problem or, in your opinion, is there any potential problem because of the degree of, you know, nutrient discharge [discharge in the effluent of nitrogen and phosphorus]?
 "Blancher: Based on the concentrations of — on the ratio of concentrations of nitrogen and phosphorus that is on the permit, there is a sixty-to-one nitrogen-to-phosphorus ratio, which means that the waste is extremely laden in nitrogen relative to the nutrient phosphorus. This is a concern to me because it could cause problems in terms of excessive oxygen demand due to the nitrogenous demands of these wastes as they are being oxidized by the microorganisms within the *Page 463 
bay. These are natural microorganisms that are in there, thus reducing the dissolved oxygen in a portion of the bay.
 "It would also — because estuaries are classically limited in their nutrient inputs and specifically limited in nitrogen, the heavy loading of nitrogen into the bay could possibly cause algal blooms, particularly some noxious algal blooms including Dinoflagellatas like we have seen bloom — this is the red tide-type organisms like we have seen bloom in the Bon Secour area.
". . . .
 "Laurendine: . . . . Obviously I understand what you are saying, but, perhaps, to make sure that all of us understand what you are doing, if I could get you to go through . . .
 "Blancher: Well, the discharge of waste into receiving water bodies has classically been looked upon as causing problems of eutrophication; that is the increase in the amount of materials which organisms feed on. Eutrophic means feeding levels, and the word eutrophication means excessive feeding, meaning you are excessively stimulating the organisms to grow within the environment. It's a classic problem that dates back — in our knowledge, the problem dates back to the 1850's when some German scientists first looked at the problems in some rivers and some areas in Germany. But to me that is a major concern whenever you are looking at the discharge of any waste stream into a receiving water body and especially if you look at the nitrogen and phosphorus concentration and what would happen to those particular parameters.
 "Laurendine: What you, in effect, are saying is the nitrogen and phosphorus content of the effluent is going to be a fertilizer and cause certain organisms. . . .
"Blancher: Yes. It certainly has the potential.
". . . .
 "Laurendine: In your opinion, would this [effluent discharge] violate water quality standards?
 "Blancher: If you continued to discharge the water quality constituents of nitrogen, BOD [biochemical oxygen demands] and COD [chemical oxygen demands] in excessive levels, okay. Even though the effluent meets water quality standards, there is a potential that because of the high oxygen demand caused by this high nitrogenous loading in the region you could deplete the oxygen in that region to zero.
 "Laurendine: Is oxygen an important constituent of, you know, water quality standards? If you have a low discharge of oxygen content of water, is that in violation of water quality standards?
 "Blancher: There are water quality standards for dissolved oxygen for receiving water bodies.
 "Laurendine: And is there a potential for violating this water quality standard because of this growth of organisms?
"Blancher: Yes.
 "Laurendine: The growth of organisms is going to increase the. . . .
 "Blancher: Well, we are getting away from the growth of organisms and just talking about the demand caused by the oxidation of the nitrogenous waste that is going in and, yes, that would have the potential of depleting oxygen in an area of the receiving water body.
 "Laurendine: And that may violate water quality standards?
 "Blancher: And that may violate water quality standards."
Thus, oxygen-demanding pollutants, once discharged into the receiving water, consume the dissolved oxygen in the water by chemical and biological processes. That can result in a depletion or lessening of the dissolved oxygen concentration in the receiving water at the same time that those pollutants are being dispersed or transported in whatever direction the circulation of Mobile Bay takes the effluent. The consequence of depletion of dissolved oxygen in the water is grave: it would kill any oxygen-consuming organism.[5] *Page 464 
Now consider the effect of stratification in relation to these dissolved oxygen concerns. The EIS says:
 "Some uncertainties are associated with the available estimates of the impact of the waste discharge on dissolved oxygen in the Bay. The first is the possible variations in plume behavior that could occur. If the discharge sinks to the bottom of the Bay under stratified conditions, the oxygen demand of the waste could be exerted in a part of the water column that is already low or devoid of dissolved oxygen. The second involves the impact of entraining bottom water low in dissolved oxygen into the plume as it rises to the surface. This could lower the oxygen concentration in the diluted plume in the vicinity of the outfall and reduce the amount of oxygen available for satisfying the oxygen demand exerted by the introduced waste within the plume.
 "A third uncertainty involves the accuracy of the estimate of the maximum loading of BOD that could be assimilated by the receiving Bay waters. The existing estimate of 4,600 pounds per day was determined with a fine-grid computer model of west-central Mobile Bay (South Alabama Regional Planning Commission, 1977). Conditions that would represent a worst-case situation for estimating the impact on dissolved oxygen of BOD loading near the outfall would be the commonly occurring late summer conditions of low river inflow, high water temperatures, light winds, high salinities, and a strongly stratified water column. The model used for making the estimate assumed the first four of these conditions, but was unable to model stratified conditions. How this factor affects the results obtained is difficult to predict, but it is likely that the use of a non-stratified model would overestimate the capacity of the Bay water to assimilate the waste load because the volume of water available for dilution and oxygen supply would be greatest under unstratified conditions.
Under stratified conditions, the volume of water available for dilution would be limited to the top several feet of the water column because of the lack of mixing with the deeper layers. Less assimilative capacity would, therefore, be available for satisfying the oxygen demand of the introduced waste. Because of this the waste load allocation would have to be less than the present estimate to meet oxygen standards. Determination of the waste load allocation under these conditions would require the use of a computer model that could simulate stratified conditions."
In part, the EIS restated what we have already discussed about stratification, the NPDES permit, and the DEM. Both the NPDES permit limitations and the DEM's maximum wasteload allocation, which is the basis for the permit limitations, cannot be relied upon to maintain water quality standards, because they do not account for stratification and its concurrent reduction in the volume of water available for mixing. The EIS went further, however, and stated: "[T]he wasteload allocation would have to be less than the present estimateto meet oxygen standards." In other words, the EIS is saying that if the DEM's maximum wasteload allocations, which are the same as the Commission's suggested NPDES permit limitations, are used, water quality violations will likely result. That is a stronger statement than Dr. Blancher made; he testified that water quality violations may result from consumption of the dissolved oxygen by oxygen-demanding materials. We emphasize the significance of this: Our discussion has demonstrated that water quality violations will likely result from using even the Commission's suggested permit limitations, which are reductionsfrom the pollutant *Page 465 discharge allowed by the permit itself. That further demonstrates that the granting of the permit must be reevaluated.
Every appellee, even the amicus, completely ignores all problems related to dissolved oxygen. At the cost of being redundant, we emphasize this point, shocking in a case of this import: None of the appellees nor the amicus addresses in anyway the dissolved oxygen concerns stated in this opinion.Instead, they all state their entire arguments concerningstratification and water quality standards in terms of fecalcoliform bacteria, as if fecal coliform were the only water quality standard applicable to Mobile Bay.
"Fecal coliform bacteria" is a water quality standard. The NPDES permit authorized the proposed effluent discharge to contain a fecal coliform concentration of 200 mpn/100 ml. The hearing officer and the Commission proposed reducing that figure to 14 mpn/100 ml, which is the figure necessary to meet the water quality standards for the shellfish harvesting water use classification, the water use classification with the most stringent restrictions for fecal coliform bacteria. In this regard, the hearing officer and the Commission acted properly, for the evidence overwhelmingly indicates that that reduction would be required to avoid risking closing the oyster reefs. Fecal coliform bacteria are not harmful to the oysters; indeed, they thrive on it. Eating oysters with excessive fecal coliform bacteria is a human health hazard, however. The State Health Department monitors the oyster reefs for fecal coliform bacteria and will close the reefs to commercial oyster harvesting when the fecal coliform bacteria exceed the accepted limits. It is noteworthy that problems concerning fecal coliform bacteria can result in the closure of the reefs until the concentrations return to acceptable limits, while the problems concerning dissolved oxygen affect the very survival of oxygen-consuming organisms.
The corrective actions taken by the hearing officer and the Commission successfully resolved the problems related to the permit's liberal limitations on fecal coliform bacteria. Even Fowl River states that fecal coliform is not an issue, if the Commission's corrective actions are upheld. Further discussion of fecal coliform at this point serves only to confuse the issues involved in this appeal.
The Court of Civil Appeals, however, accepted evidence limited in applicability to fecal coliform bacteria as evidence that applied to all water quality criteria and stratification. The court wrote:
 "Other evidence similarly indicates that the agencies considered the issue of stratification in reaching their decision. The project engineer explained that 'the concept that has been used in the analysis is that if the water quality objectives are achieved at the point of discharge, this will assure that water quality objectives will be met at any other point in the receiving waters.' He testified that the DEM demonstrated compliance with the water quality criteria for that classification at the discharge point and at every other location in the Bay. The three Fowl River experts, as well as the agencies' experts, agreed that if water quality standards were achieved in the area of the discharge, there was no reason to think that the discharge would result in water quality standards elsewhere in the Bay not being achieved."
572 So.2d at 444. That statement is correct only insofar as it addresses fecal coliform bacteria.
All of the experts agree that if the water quality standards for fecal coliform bacteria are met at the point of discharge, then the water quality standards for fecal coliform bacteria will not be violated elsewhere, because the amount of fecal coliform bacteria will not increase in the water. As we have explained, that is not the case with dissolved oxygen: oxygen-demanding materials continue to deplete dissolved oxygen concentrations even after discharge as they are circulated to other parts of Mobile Bay. Accordingly, even if water quality objectives are met with regard to dissolved oxygen at the point of discharge, there is no assurance that this *Page 466 
water quality standard will be met at other points in the receiving water.
The Court of Civil Appeals erred when it made the statements that we have been discussing.[6]
D. The Court of Civil Appeals' opinion.
In addition to the factual errors that we have already discussed, the Court of Civil Appeals made at least four more factual errors in its opinion.
The court stated that "[Duncan] testified that because the DEM was incapable of precisely simulating stratification, there would be a slight overestimation of the waste load assimilative capacity of the Bay." The record does not contain such testimony. Duncan did say that the DEM could "compensate" for stratification, but neither he nor any of the experts testified that the DEM could "simulate" stratification to any extent. As to the degree of overestimation, Duncan's testimony varied; he testified that the degree of overestimation would be "some," "10%," "10% to 15%," "twice or more," that he did not know how much it would affect it, and finally, that stratification conditions were totally unimportant with regard to the DEM.
The Court of Civil Appeals also stated that Duncan testified that "in comparing the field-testing results of both a two- and three-dimensional model, the difference in waste-load allocations would be approximately ten percent."572 So.2d at 444. The record indicates otherwise. Duncan testified that he compared a two-dimensional model of the mouth of Chickasaw Creek to a three-dimensional model of the same body of water and that the difference in the wasteload allocations predicted by the two models, not by field testing results, was approximately 10 percent. (The mouth of Chickasaw Creek is the entrance to a deep water tributary of the Mobile River and is used by oceangoing ship traffic serving the port of Chickasaw.) Duncan specifically testified that he did not compare the results of either model of Chickasaw Creek to actual field conditions.
In relation to the statement just quoted, the Court of Civil Appeals further stated that "the evidence indicated that stratification would not make more than a ten percent difference in actual dispersion rates." Id. That statement must come from a misunderstanding of Duncan's testimony, because the only evidence presented of actual dispersion rates came from Dr. Schroeder, who testified that he compared the results of a three-dimensional model of Mobile Bay with his actual field data and that the model's results were greatly different from the actual field data. Duncan's testimony, at best, showed that between the two models, there was very little difference in the predictions for the wasteload assimilative capacity of Chickasaw Creek. All of the experts agreed that the three-dimensional model was unproved and experimental.
The Court of Civil Appeals wrote:
 "Additionally, the permit requires that a diffuser system be used to provide initial mixing at the outfall. The project engineer testified that the purpose of the diffuser is to mix effluent with the Bay waters. For example, if the Bay is stratified from a point five feet to the bottom with salty water and from five feet up to ten feet with fresh water, the diffuser would mix the water from top to bottom at the point of discharge. There was substantial evidence in the record that the use of the diffuser will completely compensate for any stratification that *Page 467 
may occur and effectively obviate stratification as an issue."
The record does not support either the example given by the court or the assertion that the diffuser will "completely compensate for stratification." Actually, the record reveals exactly the opposite. Dr. Schroeder, Dr. Blancher, Dr. Crozier (another scientist at Dauphin Island Sealab), the EIS, and Duncan confirmed that even with a diffuser, the effluent would either mix with whatever stratum it was most similar to in density or would form its own layer, if it was more dense than the top layer and less dense than the bottom layer; or it would sink to the bottom, if it was denser than the other layers. Additionally, the record contains no substantial evidence that a diffuser would mix the water from the bottom to the top at the point of discharge in such a way that the effects of stratification would be negated. As a matter of fact, at the time of the adjudicatory hearing, the Sewer Board, which had the responsibility for designing the diffuser system, had not approved any design for a diffuser.
 III. Judgment
The Court of Civil Appeals erred in the several ways previously discussed: The court made several factual errors in its opinion, particularly regarding stratification, as well as regarding dissolved oxygen; the court erred when it reversed the trial court's order that held that the "agencies below failed to thoroughly investigate [stratification] and its possible effects;" and the court erred in its interpretation of the antidegradation policy.
Furthermore, the record does not support a holding that affirms the granting of the NPDES permit. Instead, the record indicates that water quality violations may result or will likely result if the permit is granted, even with the Commission's suggested permit limitations, which are reductionsfrom the effluent discharge allowed by the permit itself. The NPDES permit is due to be denied. The judgment of the Court of Civil Appeals is due to be reversed, and the cause remanded to that court with instructions for it to remand for the trial court to enter a judgment that denies the NPDES permit.
REVERSED AND REMANDED WITH DIRECTIONS. REHEARING OVERRULED; OPINION MODIFIED.
HORNSBY, C.J., and JONES, SHORES, HOUSTON and STEAGALL, JJ., concur.
MADDOX, J., recused.
[1] For the sake of simplicity, we refer to the arguments raised by any of the appellees as ADEM's arguments.
[2] Because subject matter jurisdiction is always pertinent to a court's determination in any case, see Rule 12(h)(3), A.R.Civ.P., we note that the Eleventh Circuit Court of Appeals' interpretation of Ala. Code 1975, § 22-22A-7(c), which gives "aggrieved" persons the right to appeal an ADEM decision on a permit application to the Commission, is incorrect. In Save OurDunes v. Alabama Dept. of Environmental Management,834 F.2d 984 (11th Cir. 1987), the court held that a person is not "aggrieved" so as to have standing to appeal an ADEM permit decision unless that person can show that the ADEM decision "adversely affected their legal or equitable interests in land." 834 F.2d at 989. Basically, the Eleventh Circuit ruled that a person cannot challenge an ADEM decision unless that person owns a property interest directly affected by the decision. This is simply not the law in Alabama. In cases involving appeals from ADEM decisions and in other cases, this Court has allowed "aggrieved" persons standing to appeal despite the fact that they did not own property affected by the decision in question. See Ex parte Baldwin County Comm'n,526 So.2d 564 (Ala. 1988), and Johnson v. Rice, 551 So.2d 940 (Ala. 1989). It is not necessary in this case to delineate exactly who is, and who is not, an "aggrieved" person, because the parties that appealed this ADEM decision clearly qualify under the statute. We only wish to point out that matters of environmental protection and regulation are of great significance to the citizens of Alabama, and that a citizen's statutory right to appeal an ADEM decision should be interpreted broadly. Indeed, the Eleventh Circuit's decision inSave our Dunes is curious in light of the broad interpretation placed on citizen standing provisions in federal environmental statutes. See Sierra Club v. Morton, 405 U.S. 727,92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Morton certainly does not require that a person own a property interest affected by an administrative decision in order to appeal that decision. See also Duke Power Co. v. Carolina Environmental Study Group,Inc., 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978).
[3] Two scientists from Dauphin Island Sealab testified. Dr. William Schroeder has a Ph.D in oceanography. Dr. George Crozier is executive director of the Marine Environmental Sciences Consortium and has a Ph.D in marine biology. Dr. Eldon Carl Blancher is an environmental engineer and ecologist who formerly worked at Dauphin Island Sealab and who presently is a professor at the University of South Alabama.
[4] Admittedly, Duncan's lengthy testimony is a maze of inconsistencies and self-contradictions from which nearly any argument germane to this appeal can be made. We use Duncan's testimony at various times to explain our discussion only because, in the particular instance, he expressed clearly an idea that others had already expressed or confirmed.
[5] SARPC compounded any dissolved oxygen problem by using estimates of water quality that are below the applicable water quality standards. The dissolved oxygen standards for all three classifications in Mobile Bay, fish and wildlife, swimming, and shellfish harvesting, are 5.0 milligrams/liter (mg/1). SARPC's Theodore analysis, establishing the wasteload allocations that are now part of the NPDES permit, assumed that the dissolved oxygen standard for shellfish was 4.7 mg/l; that assumption was wrong, because the water quality standards explicitly state that 5.0 mg/1 is the dissolved oxygen requirement for shellfish harvesting.
[6] We note here one area of concern that was not addressed in the previous discussion. The hearing officer's report contended that it would require a "worst case of worst case scenario" for there to be dissolved oxygen problems. The record does not support that holding. Instead, the record indicates that the "worst case" scenario occurs frequently in late summer and early fall; the EIS stated:
 "Conditions that would represent a worst-case situation for estimating the impact on dissolved oxygen of BOD loading near the outfall would be the commonly-occurring late summer conditions of low river inflow, high water temperatures, light winds, high salinities and a strongly stratified water column."
The record, particularly the testimony of the scientists from Dauphin Island Sealab, uniformly supports this.